## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| STEPHANIE LYNN FORD, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Civil Action No. 06-301-MPT |
| | : | (Consolidated) |
| CHRISTIANA CARE HEALTH SYSTEMS, | : | |
| Richard Burton and Clara Clark, | : | |
| | : | |
| Defendants. | : | |
| | : | |
| | : | |

## **MEMORANDUM OPINION**

Stephanie Lynn Ford, New Castle, Delaware.
Plaintiff, pro se.

David H. Williams and James H. McMackin, III, Morris James LLP, Wilmington,
Delaware.
Counsel for Defendants.

Michael J. Ossip and Thomas S. Bloom, Morgan, Lewis & Bockius LLP, Philadelphia,
Pennsylvania.
Counsel for Defendants.

May 13, 2008
Wilmington, Delaware

Thynge, U.S. Magistrate Judge

## I. INTRODUCTION

Plaintiff Stephanie Lynn Ford ("Ford") filed a *pro se* complaint alleging various employment related claims against Christiana Care Health Systems ("CCH"), Clara Clark ("Clark") and Richard Burton ("Burton") ("defendants," collectively). Before the court are the parties' cross motions for summary judgment and CCH's motion to dismiss C.A. 07-529 because the action is duplicitous of the other two consolidated matters.[1]

## II. BACKGROUND

### A.   Procedural Background

Ford commenced her action *pro se* on May 8, 2006.[2] The initial complaint relates to the termination of her employment and its effect on her right to receive certain health and pension benefits. Ford alleged discriminatory action on the part of her employer, CCH and certain supervisors, Clark and Burton. Ford simultaneously filed a complaint in the Court of Common Pleas for the State of Delaware. The action filed in the state court was properly removed to the District Court and consolidated by Judge

---

[1] A third complaint was filed, C.A. No. 07-529-MPT and is a putative class action claim. That action is substantially related to the instant matter. Ford has instituted three actions against the same defendants with the initial action filed on May 8, 2006 (C.A. No. 06-301-MPT). The second action was filed on July 28, 2006, which alleges essentially the same claims. *See* C.A. No. 06-458-MPT. The third action, C.A. No. 07-529 was filed on September 4, 2007. On October 3, 2006, the Honorable Kent A. Jordan, the original judge assigned to the first two matters, entered an Order consolidating them and made C.A. No. 06-301 the lead matter. On March 19, 2007, the parties stipulated to Magistrate Judge Thynge's jurisdiction to conduct all proceedings in those matters. Subsequently, in response to CCH's motion to consolidate which Ford did not oppose, Judge Farnan consolidated C.A. No. 07-529 with the prior two cases and assigned the matter to Judge Thynge. Because of the previous consolidation and consent, C.A. No. 07-529 is assigned to Judge Thynge and consolidated with 06-301 as the lead matter.

[2] D.I. 2.

Jordan.[3]  The parties consented to the jurisdiction of Magistrate Judge Mary Pat

Thynge.[4]  With discovery completed, Ford filed a "case dispositive motion" which is

treated as a motion for summary judgment.[5]  Defendants have also moved for summary

judgment.[6]

## B.    Factual Background

Ford was an employee of CCH for over sixteen years, receiving numerous

certificates of appreciation for her years of dedication and loyal service in the Medical

Records and Radiology Departments.  On October 28, 2003, Ford took a medical leave

of absence to recover from injuries she suffered in an automobile accident.  The injuries

consisted of various strains and trauma to her back, ribs, shoulders and arms.  On

November 11, 2003, Ford requested her leave be designated under the Family and

Medical Leave Act ("FMLA").  Although Ford filed for FMLA leave in November 2003,

CCH's policy is retroactive, making the effective date of FMLA leave October 28, 2003,

the first day Ford was absent from work.

Ford signed an FMLA form which instructed her that her job was guaranteed for

up to twelve weeks of leave, but no more.  Thereafter, CCH attempts to place

employees in an available position, but with no guarantee of future employment.  If an

employee cannot be placed within twenty-four weeks, CCH's policy mandates removal

of that employee from the payroll.  Ford did not attempt to return to work within the initial

---

[3] All complaints will be referenced herein as "complaint."

[4] D.I. 64.

[5] D.I. 48

[6] D.I. 54

3

twelve week period.  Ford was given notice that she would be removed from the payroll on April 13, 2004, the twenty-four week deadline.  On April 13, 2004 Ford arrived at CCH with a doctor's note clearing her for work subject to a lifting restriction.  At that time, Ford's position was already filled and she did not apply for or receive any other position at CCH and was removed from the payroll.

Notwithstanding Ford's removal, CCH scheduled Ford to meet with an internal recruiter, Burton, to assist her in identifying and applying for other open positions at CCH.  Burton did not have hiring authority.  While Ford had several interviews, no job was ultimately offered.  In sum, Ford applied for twenty-nine new positions without success, including in the medical records department where she was refused a position by the supervisor, Clark.

## C.    Plaintiff's Contentions

The thrust of Ford's argument is that CCH wrongfully terminated her employment, and that Burton and Clark refused to hire her based on discriminatory purposes. Specifically, Ford alleges in her brief the following acts of misconduct by the defendants: violation of Civil Rights Act of 1991 Title 1; violation of Title V of the Americans with Disabilities Act ("ADA"); violation of Title VII of the Civil Rights Act of 1994; race discrimination; employment discrimination; violation of the FMLA; violation of the Employee Retirement Income Security Act ("ERISA"); 29 U.S.C. 1132; wrongful termination of pension benefits; wrongful termination of retiree pension benefits; wrongful termination of life insurance policy; and wrongful termination of her health

insurance benefits.[7]

Ford accuses Burton of misconduct in refusing to place her in a position upon her return to work in April 2004, and for telling Ford to "[f]ind other employment at another corporation." Ford also faults Clark for refusing to hire her in the medical records department, a position Ford previously held for nine years. Ford claims that she was told she was not qualified for any of the open positions at CCH. Ford seems to allege a conspiracy among the defendants and other workers at CCH to deny her a position.

## D.    Defendants' Contentions

Defendants break down Ford's complaint into three potential claims: (1) CCH's failure to rehire Ford violated the ADA; (2) the termination of Ford's employment violated the FMLA; and (3) that Ford was deprived of certain benefits in violation of ERISA.

Defendants argue that Ford's ADA claim fails because she never filed an administrative charge of discrimination; she does not have a disability within the meaning of the ADA; and there is no evidence presented that the failure to rehire was motivated by any disability.

Defendants state that any FMLA claim is time-barred and also fails because CCH provided Ford with twenty-four weeks of medical leave, twice the amount to which she was entitled under the FMLA.

Finally, defendants argue that Ford's ERISA claim is also time-barred and that she is not being denied any benefits which she had a right to receive. Further, defendants note that there is no evidence that the decision to terminate Ford was

---

[7] These allegations differ from those asserted in Ford's complaint, and certain of the claims do not provide for a cause of action, even with the most liberal reading of her *pro se* complaint.

motivated in any way by an intent to interfere with her rights under ERISA.

## III. LEGAL STANDARD

Summary Judgment is appropriate if the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law."[8]  Once there has been adequate time for discovery, Rule 56(c) mandates judgment against the party that "fails to make a sufficient showing to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[9]  When a party fails to make such a showing, "there can be no 'genuine issue as to any material fact' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."[10]  The moving party is therefore entitled to judgment as a matter of law because "the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.[11]  A dispute of material fact exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."[12]

The moving party bears the initial burden of identifying portions of the record

---

[8] Fed. R. Civ. P. 56(c).

[9] *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

[10] *Id.* at 323.

[11] *Id.*

[12] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

which demonstrate the absence of a genuine issue of material fact.[13]  However, a party

may move for summary judgment with or without supporting affidavits.[14]  Therefore, "the

burden on the moving party may be discharged by 'showing' – that is, pointing out to the

district court – that there is an absence of evidence supporting the nonmoving party's

case."[15]

   If the moving party has demonstrated an absence of material fact, the nonmoving

party must then "come forward with specific facts showing that there is a genuine issue

for trial."[16]  If the nonmoving party bears the burden of proof at trial, he "must go beyond

the pleadings in order to survive a motion for summary judgment."[17]  That party "may not

rest upon the mere allegations or denials of his pleadings, but must set forth specific

facts showing that there is a genuine issue for trial."[18]  At the summary judgment stage,

the court is not to "weigh the evidence and determine the truth of the matter, but to

determine whether there is a genuine issue for trial."[19]  Further, "there is no issue for trial

unless there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party."[20]  The threshold inquiry therefore is "determining whether there is

---

[13] *Celotex*, 477 U.S. at 323.

[14] *Id.*

[15] *Id.* at 325.

[16] Fed. R. Civ. P.  56(c).

[17] *Yeager's Fuel v. Pennsylvania Power & Light Co.*, 22 F.3d 1260, 1273 (3d Cir. 1994).

[18] *Anderson*, 477 U.S. at 248.

[19] *Id.* at 249.

[20] *Id.*

a need for trial – whether, in other words, there are any genuine factual issues that

properly can be resolved only by a finder of fact because they may reasonably be

resolved in favor of either party."[21]

This standard does not change merely because there are cross-motions for

summary judgment.[22]  Cross-motions for summary judgment

> are no more than a claim by each side that it alone is entitled to summary
> judgment, and the making of such inherently contradictory claims does not
> constitute an agreement that if one is rejected the other is necessarily justified or
> that the losing party waives judicial consideration and determination whether
> genuine issues of material fact exist.[23]

Moreover, "[t]he filing of cross-motions for summary judgment does not require the court

to grant summary judgment for either party."[24]

## IV. DISCUSSION

### A.   *Pro Se* Litigant's Claims

Pleadings commenced by a *pro se* litigant, "however inartfully pleaded," are held

to "less stringent standards than formal pleadings drafted by lawyers."[25]  Given Ford's

status as a *pro se* litigant, this court will make the appropriate inferences in analyzing her

claims.  It that context, the court must first determine what actionable claims Ford

alleges in her complaint, given the numerous assertions made against defendants.  A

liberal reading of Ford's complaint reveals the following claims: (1) that defendants are in

---

[21] *Id.* at 250.

[22] *Appleman's v. City of Philadelphia*, 826 F.2d 214, 216 (3d Cir. 1987).

[23] *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968).

[24] *Krups v. New Castle County*, 732 F. Supp. 497, 505 (D. Del. 1990).

[25] *Haines v. Kerner*, 404 U.S. 519, 520 (1972).

8

violation of the ADA;  (2) that defendants are in violation of the FMLA;  (3) that

defendants are in violation of ERISA; (4) that defendants are in violation of the Delaware

Discrimination in Employment Act, 19 *Del. C.* §§ 710-718; and (5) that defendants are in

violation of the Delaware Unfair Trade Practices Act, 18 *Del. C.* §§ 2301-2316.  When

read in conjunction with her "case dispositive motion" it is clear that Ford is also

asserting a claim of race discrimination.

### B.    Ford's Title VII Claims Fail

#### 1.    Failure to Exhaust Administrative Remedies

Any Title VII claim or its state equivalent, 19 *Del. C.* §§ 710-718, such as job

discrimination based on race or gender, or an ADA claim, requires the plaintiff to

exhaust certain administrative remedies before suit may be filed in court.[26]  Those

administrative remedies are set forth in 42 U.S.C. § 2000e-5, and require a plaintiff to

first lodge a complaint with either the Equal Opportunity Employment Commission

("EEOC") or the equivalent state agency responsible for investigating claims of

employment discrimination, such as the Delaware Department of Labor ("DDOL").[27]  The

party must then wait 180 days before foregoing administrative relief and filing suit.[28]  If

the EEOC or equivalent state agency decides not to pursue plaintiff's claims and issues

a Right to Sue letter, only then may a plaintiff file suit in court.[29]  The Title VII and ADA

claims asserted by Ford, therefore, must first proceed through the administrative

---

[26] *Churchill v. Star Enters., Inc.*, 183 F.3d 184, 190 (3d Cir. 1999).

[27] 42 U.S.C. 2000e-5(e).

[28] *Id.*

[29] 42 U.S.C. 2000e-5(f)(1).

procedure.

In the instant matter, it is undisputed the Ford failed to file any administrative charge with either the EEOC, DDOL, or any federal or state agency asserting a claim of discrimination. Therefore, those claims must be dismissed. The latest time available for Ford to file an administrative charge was 300 days after the last incident of alleged discriminatory conduct.[30] Even if this court were to assume that the latest alleged incident of unlawful conduct occurred as recently as the filing of her complaint on May 8, 2006, the 300 day limit for Ford to file an administrative charge has long since passed.[31] For this reason, Ford has not only failed to file an administrative charge before bringing suit, but the deadline has passed to raise any employment discrimination claim by a significant time period.

The Third Circuit recognizes certain exceptions to the timely filing requirements of employment discrimination claims, and given Ford's *pro se* status, the court will analyze whether those exceptions apply. Three possible exceptions to the filing requirements are: equitable tolling, continuing violations, and the single filing rule.

"Under equitable tolling, plaintiffs may sue after the statutory time period for filing a complaint has expired if they have been prevented from filing in a timely manner due to sufficiently inequitable circumstances."[32] This doctrine prevents a statute of limitations

---

[30] The 300 day period applies where plaintiff has initially instituted proceedings with a state or local agency. Otherwise, the time period is only 180 days for the EEOC. Given Ford's *pro se* status, the court will apply the lengthier applicable time period. 42 U.S.C 2000e-5(e). According to Ford's exhibits, however, the last position for which she applied at CCH occurred on July 8, 2004. That position was as a security officer.

[31] *See Gadson v. City of Wilmington Fire Dep't*, 478 F. Supp. 2d 635, 640 n.2 (D. Del. 2007).

[32] *Seitzinger v. Reading Hosp. & Med Ctr.*, 165 F.3d 236, 240 (3d Cir. 1999).

period from running after a claim has accrued, and "should be applied 'sparingly.'"[33] The
Third Circuit recognizes three situations in which tolling may be appropriate:

> (1) where the defendant has actively misled the plaintiff with respect to the
> plaintiff's cause of action, and that deception causes noncompliance with an
> applicable limitations period; (2) where the plaintiff in some extraordinary way has
> been prevented from asserting her rights; (3) where the plaintiff has timely
> asserted her rights mistakenly in the wrong forum.[34]

In the instant matter, there is no evidence that Ford missed the filing deadline
because she was misled by defendants. In fact, Ford admits being advised to seek
employment elsewhere by Burton. There is nothing misleading about that statement.
Ford, however, continued to seek employment at CCH, and never filed a charge of
discrimination with the appropriate administrative agency. Further, there is no evidence
that Ford was in any way prevented from filing an administrative charge. Moreover,
there is no evidence that Ford filed in the wrong forum, because she did not file a charge
with any administrative agency, that is, with either the DDOL or the EEOC. Thus, the
doctrine of equitable tolling cannot cure Ford's failure to follow the statutorily imposed
administrative procedures.

The second exception concerns the theory of continuing violations, where "a
plaintiff may pursue a Title VII claim for discriminatory conduct that began prior to the
filing period if he can demonstrate that the act is part of an ongoing practice or pattern of

---

[33] *Podobnik v. USPS*, 409 F.3d 584, 591 (3d Cir. 2005) (citing *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)).

[34] *Id*.

11

discrimination of the defendant."[35] To invoke this doctrine, a plaintiff must demonstrate that "at least one act occurred within the filing period" and the alleged acts of unlawful conduct are "more than the occurrence of isolated or sporadic acts of intentional discrimination."[36]  Acts considered to be easily identified as isolated acts of discrimination and consistent with the continuing violations theory are "termination, failure to promote, denial of transfer, or refusal to hire."[37]

In the instant matter, Ford specifically alleges that defendants' wrongful conduct consisted of termination of employment and benefits, as well as, refusing to hire.  Those acts are isolated and discrete.  The twenty-nine jobs that Ford applied to in which she was refused a position were not part of a continuous violation, rather, they were each distinct, isolated incidents with their own 300 day time period.  Even assuming that the last of those discrete acts occurred on the date this complaint was filed, the 300 day time period has long since passed.

Assuming *arguendo*, that the termination of employment and the twenty-nine refusals meet the "continuing violations" exception, her claim still fails because: (1) Ford never filed any administrative charge; and, (2) the continuing violations theory allows the court to look to the last incident of alleged discriminatory conduct in setting the time period for the filing of an administrative charge.  Since the court in its analysis has assumed that the discriminatory conduct continued to the date that the complaint was filed, the time for filing a charge has expired.

_____

[35] *West v. Phila. Elec. Co.*, 45 F.3d 744, 754 (3d Cir. 1995).

[36] *Id.* at 754-55.

[37] *Morgan*, 536 U.S. at 114.

The final exception that could apply is known as the "single filing rule" which

permits a plaintiff to *join* a class action, if the party that instituted the class action alleged

class based discrimination in an EEOC charge, even though the plaintiff seeking to join

has not complied with the filing deadlines.  In the present matter, there is no class action

to which Ford is seeking to join.  Similarly, any attempt by Ford to institute a class action

is of no avail, because this exception only allows a plaintiff to *join* a class action, not start

one, when she has not complied with the procedural requirements.[38]

As Ford has not complied with the administrative requirements of Title VII and the

ADA, and because no exception applies, any claims of employment discrimination,

whether race related or arising under the ADA, are time-barred and entitle defendants to

summary judgment.[39]

### 2.    Lack of Disability

In addition to the procedural defects, Ford's ADA claim fails because she has not

produced sufficient evidence demonstrating a disability within the meaning of the ADA.

Under 42 U.S.C. § 12112(a):

> No covered entity shall discriminate against a qualified individual with a disability
> because of the disability of such individual in regard to job application procedures,
> the hiring, advancement, or discharge of employees, employee compensation,
> job training, and other terms, conditions, and privileges of employment.

---

[38] Moreover, Ford may not institute a class action because she is proceeding *pro se*.  As noted in *Oxendine v. Williams*, 509 F.2d 1405 (4th Cir. 1975), such an action would be "plain error," as "a layman, untutored in the law cannot 'adequately represent' the interests of the members of a 'class.'" *Huddleston v. Duckworth*, 97 F.R.D. 512, 514 (N.D. Ind. 1983) (*citing Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1090 (3d Cir. 1985)).  Therefore, Ford's attempts to raise the same claims against CCH under the guise of a class action suit in C.A. No. 07-529 fail and should also be dismissed.

[39] Included in this grant of summary judgment is any claim brought under the Delaware Discrimination in Employment Act, 19 *Del. C.* §§ 710-718, which requires similar administrative steps to be taken prior to filing suit.

In order to establish a cause of action under the ADA, a plaintiff must be a "qualified individual with a disability."[40] A disability is defined as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."[41] The disabling impairment must one of "permanent or long-term impact" that "prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives."[42]

The impairments Ford attributes to the motor vehicle accident on October 27, 2003 consist of back, neck and right rib pain. Ford indicates that she "have been experiencing a great of pain to my right rib, which have swelled and have been causing me a lot of discomfort." The most recent examination by a Dr. Aaron Robinson, D.O., revealed a lump on the right rib, a fatty structure consistent with lipoma or hernia. Ford also indicates that initially after the accident the pain in her back was severe enough that she had trouble walking upright. A November 10, 2003 report from Ford's treating physician indicates that Ford was in mild distress and showed signs of overall improvement in her neck, back and rib pain.

While Ford does establish that she suffered certain injuries from the accident, the impairments she stresses do not rise to the level of the substantially limiting and severely restricting impairments envisioned by the ADA. Nowhere does Ford indicate that she is substantially limited in a major life activity. To the contrary, Ford asserts that the necessary treatment helped her to get well. In short, the impairments cited by Ford

---

[40] *Marinelli v. City of Erie*, 216 F.3d 354, 363 (3d Cir. 2000); 42 U.S.C. § 12112(a).

[41] 42 U.S.C. § 12102(2)(A).

[42] *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 198 (2002).

appear to be temporary in duration and mild in severity, placing her outside of the
severely restricting impairments encompassed under the ADA.

### 3.    No Evidence of Racial Discrimination

In addition to the procedural defects under this claim, the sum of Ford's evidence
of racial discrimination is (1) a blanket assertion claiming the actions of Burton, Clark
and two individuals not parties to this suit in terminating her pension benefits on April 13,
2004, "is just pure race discrimination, at its highest form" and (2) a second assertion
where Ford says, "I. . . honestly feel that I was discriminated against, because I am a
black female African American."

Ford does not present any direct evidence of racial discrimination, so the court
will look to the pretextual theory to determine if she asserts a claim.  Under this theory,
Ford must establish that: (1) she was a member of a protected class; (2) she was
qualified for the positions;[43] and (3) people outside of the protected class were treated
more favorably.[44]

Ford is a member of a racial minority and the court will assume that she was
qualified for all the positions applied for, including her previous position in the Radiology
Department.  Even with those assumptions, Ford still fails to satisfy the third prong of the
test.  Ford provides this court with no evidence indicating that any person outside of her
protected class was treated more favorably than she in applying for any of those twenty-
nine jobs.  Thus, even if Ford had complied with the procedural requirements, her claim

---

[43] Ford has presented no evidence that she was qualified for any of the positions.

[44] See McDonell Douglas Corp v. Green, 411 U.S. 792, 802-03 (1973).

still fails.[45]

## C.    FMLA

### 1.    Statute of Limitations

Any action alleging a violation of the FMLA must be brought within two years of

the last act constituting the alleged violation for which the action is brought.[46]  Ford was

removed from the payroll on April 13, 2004, yet filed the complaint in the instant matter

on May 8, 2006, more than two years after the last alleged act of violation.  Thus, Ford's

claim is barred by the statute of limitations.

### 2.    FMLA Claim Fails on the Merits

Even assuming that this claim is timely, defendants are still entitled to summary

judgment concerning any FMLA claim.  Under the FMLA, eligible employees are entitled

to up to "12 workweeks of leave during any 12-month period."[47]  Consistent with the

FMLA, CCH's leave of absence policy guarantees an employee's position for those

twelve weeks.  If the initial twelve week time period is exhausted, an employee's job is

no longer guaranteed:  however, CCH's policy is to keep the employee on the payroll for

an additional twelve weeks and assist the employee in finding and applying for any

available positions.  If alternate employment is not obtained within the additional time

frame, CCH removes the employee from the payroll.

In the instant matter, Ford requested her absence be designated as FMLA leave

---

[45] Similarly, to the extent that Ford is alleging gender discrimination, the analysis is the same under *McDonell Douglas Corp*.  Her claim still fails in the absence of any evidence that individuals outside the protect class were treated more favorably or hired instead of her.

[46] 29 U.S.C. § 2617(c)(1).

[47] 29 U.S.C. § 2612(a)(1).

Case 1:06-cv-00301-MPT Document 81 Filed 05/13/2008 Page 17 of 21

on November 11, 2003. Pursuant to CCH's retroactive policy, this request designated Ford's leave as beginning on the first day of absence, October 28, 2003. Thus, Ford's position was guaranteed for twelve weeks from October 28, 2003, at which time her position would no longer be guaranteed, but she would remain on CCH's payroll for an additional twelve weeks. That twenty-four week period ended on April 13, 2004. It is undisputed that Ford did not return to work within the initial twelve week period. Therefore, it is abundantly clear that she was no longer guaranteed her previous position in the Radiology Department.

Similarly, Ford took no further action, and made no attempts to return to work until April 13, 2004, the last day of the twenty-four week period. On April 13, Ford was cleared for work by Dr. Ufberg, her treating physician, subject to a lifting restriction.[48] However, because her position was already filled due to her extensive absence, and because she had not applied for any alternate positions, at this point, Ford had no position at CCH. Accordingly, and pursuant to CCH's leave of absence policy signed by Ford, CCH removed Ford from the payroll effective April 13, 2004.

All of the evidence indicates that defendants not only complied fully with the FMLA requirements and CCH's own leave of absence policy, but went beyond their statutorily imposed duties and actively assisted Ford in identifying and applying for alternate employment within CCH. Thus, defendants complied with the FMLA, and any claim to the contrary by Ford fails.

---

[48] She was later cleared for return to work by Dr. Ufberg with no restrictions effective June 14, 2004.

17

### D.    ERISA

#### 1.    Statute of Limitations

Denial of benefits under ERISA are subject to Delaware's one year statute of limitations.[49]  Ford filed her complaint more than two years after the date she was terminated from employment, April 13, 2004.  As such, any ERISA claim by Ford is barred by the applicable statute of limitations.

#### 2.    Denial of Benefits 29 U.S.C. § 1132(a)(1)(B)

Even assuming Ford's claims are timely, her claim still fails on the merits.  A liberal reading of Ford's "case dispositive motion" does not provide the court with any guidance as to how defendants violated ERISA.  29 U.S.C. § 1132 allows a participant to bring a civil action

> to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.[50]

Ford alleges that her benefits were wrongfully terminated, yet does not indicate, in any manner, how the termination of certain benefits were wrongful.  Ford seems to imply that defendants and Unum Life Insurance of America[51] conspired against her in some way and deceitfully terminated certain benefits without notice or just cause.

Contrary to Ford's allegations of misconduct, however, the evidence indicates that Ford was well aware that her benefits were at risk should she not return to work.  CCH's

---

[49] *Syed v. Hercules Inc.*, 214 F.3d 155, 161 (3d Cir. 2000).

[50] 29 U.S.C. § 1132(a)(1)(B).

[51] Unum is the benefits provider.

request for leave of absence form, initiated and signed by Ford to request leave, clearly

indicates that *group* health coverage will be maintained by the employer; however, such

benefits are conditioned on the employee returning to work within a twelve week period.

Further, Ford was specifically put on notice in two separate letters from CCH that she

should contact the Benefits Section of CCH in order to convert her life insurance and

continue health coverage. There is no evidence indicating that defendants prevented

Ford from continuing either.

According to the evidence provided, long term benefits were discontinued

consistent with her benefits package. Ford did not continue her life insurance. With

regard to any pension benefits, the evidence indicates that Ford will begin receiving

pension benefits upon reaching the age of retirement. Thus, there is no evidence that

defendants wrongfully ended her life insurance, health care benefits or pension and they

are entitled to summary judgment with respect to this claim.

### 3.    Wrongful Discharge 29 U.S.C. § 1140

Section 510 of ERISA, 29 U.S.C. § 1140 provides in pertinent part that

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline or
discriminate against any participant or beneficiary for exercising any right to which
he is entitled under the provisions of an employee benefit plan. . . . for the
purpose of interfering with the attainment of any right to which such participant
may become entitled under the plan.[52]

In order to maintain a claim under Section 510, plaintiff must establish that defendant

had the specific intent to violate ERISA, and the mere proof of an incidental loss

---

[52] 29 U.S.C. § 1140.

19

resulting from termination will not suffice to establish that intent.[53]

The evidence indicates that any benefits that were terminated were due to defendants following their benefits policies, of which Ford was well aware. There is no evidence that defendants acted wrongfully and discharged Ford with the specific purpose of keeping her from obtaining a vested benefit.[54]  As such, defendants are entitled to summary judgment with respect to this claim.

### E.    Title 18

Ford's complaint alleges violations of "Title 18 sections 2301 to 2318."  That claim appears to imply violations of Delaware Unfair Trade Practices Act ("DUTPA"), which is comprised of 18 *Del. C.* §§ 2301-16.  Included in DUTPA are prohibitions against discriminatory behavior committed by any individual as it relates to the business of insurance.

However, there is no private cause of action under this section.[55]  Further, any potential claim under this section would be preempted by ERISA.[56]  Thus, defendants are entitled to summary judgment with respect to any Title 18 claim.

### F.    CCH's Motion to dismiss C.A. 07-529 MPT[57]

Ford's third action, C.A. 07-529, was consolidated with the instant matter given

---

[53] *Dewitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 522-23 (3d Cir. 1997).

[54] *See Harberern v. Kaupp Vascular Surgeons Ltd.*, 24 F.3d 1491, 1501 (3d Cir. 1994).

[55] *Yardley v. U.S. Healthcare, Inc.*, 698 A.2d 979 (Del. Super. 1996), *aff'd* ., 693 A.2d 1083 (Del. 1997).

[56] *Id.*

[57] As noted previously herein, CCH moved to dismiss the third action on the basis that it asserts nearly identical claims as in the prior action. *See* D.I. 9-10. Ford did not file any opposition to this motion.

the substantially identical nature of all three cases. The only apparent difference with the latest action is that it purports to be a class action lawsuit. Ford, as a *pro se* litigant, cannot institute a class action.[58]

Further, it is clear that the claims alleged in C.A. 07-529 are identical to those already alleged in consolidated C.A. 06-301.[59] It is well settled that a plaintiff "[has] no right to maintain two separate actions involving the same subject matter at the same time in the same court and against the same defendant."[60] Thus, the claims in C.A. 07-529 are both duplicitous of those in the previous actions and fail on the merits as previously discussed, and are hereby dismissed.

## V. CONCLUSION

For the reasons contained herein, Ford's motion for summary judgment (D.I. 48 for 06-301) is DENIED; defendants' motion for summary judgment (D.I. 53 for 06-301) is GRANTED; and CCH's motion to dismiss (D.I. 9 for 07-529) is GRANTED as contained in the Order that follows.

---

[58] *See Kramer v. Scientific Control Corp.*, 534 F.2d 1085, 1090 (3d Cir. 1985). *See also* n.39, *supra*.

[59] Although the original consolidated actions 06-301-MPT and 06-458-MPT were initiated against three defendants, including CCH, the court's conclusion does not change because the third action, 07-529-MPT was brought only against CCH. In her latest complaint, like the other two prior matters, Ford again asserts claims related to the termination of her employment and its effect on her alleged right to receive pension and certain other benefits. She reiterates the twenty-nine positions for which she applied after her termination, claiming discrimination based on race, violation of ERISA and FMLA. Attached to that complaint appears to be excerpts from her case dispositive motion brief. She also alleges similar damages resulting therefrom.

[60] *Walton v. Eaton Corp.*, 563 F.2d 66, 70 (3d Cir. 1977).

21